UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTHONY MILEWSKI,

    Plaintiff,

v.

    Case No. 22-cv-12176
    HON. MARK A. GOLDSMITH

JACOB LOPEZ et al,

    Defendants.
_____/

## OPINION & ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 39)

Plaintiff Anthony Milewski, who was shot after chasing his then girlfriend through a trailer park with a knife, filed this lawsuit alleging: (i) a 42 U.S.C. § 1983 claim against Defendants Officers Jacob Lopez, Kyle Johnson, Edward Talia for using excessive force in violation of his Fourth Amendment Rights; (ii) a municipal liability claim against Defendant the City of Sterling Heights; and (iii) state-law claims against the officers, including gross negligence and intentional infliction of emotional distress. Compl. at ¶¶ 48–75 (Dkt. 1). Before the Court is Defendants' motion for summary judgment (Dkt. 39). For the reasons that follow, the Court grants Defendants' motion.[1]

### I.    BACKGROUND

On the evening of September 15, 2019, Milewski, his then girlfriend Bethany Heythaler, Alex Pajakowski, and Jesssica Stanek gathered in Milewski's trailer for group sex. Milewski Dep.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Milewski's response (Dkt. 42) and Defendants' reply (Dkt. 45).

Tr. at 75–76, 78–81 (Dkt. 39-2). The four of them drank together for several hours and eventually made their way to Milewski's bedroom. Id. at 80–82, 84.

At some point, Milewski left the bedroom to make mixed drinks. Id. at 84. When Milewski returned to the bedroom, he saw the other three fondling each other, which upset him because they were not supposed to begin "sexual advances" without him in the room. Id. at 85. Pajakowski then became upset with Milewski, got off the bed, shut the door in Milewski's face, and continued to hold it shut. Id. at 88. Milewski then warned him that if he did not open the door, he would kick it in. Id. at 89. When Pajakowski did not open the door, Milewski kicked the door in and the two began "grappling." Id.

Tr. at 75–76, 78–81 (Dkt. 39-2). The four of them drank together for several hours and eventually made their way to Milewski's bedroom. Id. at 80–82, 84.

At some point, Milewski left the bedroom to make mixed drinks. Id. at 84. When Milewski returned to the bedroom, he saw the other three fondling each other, which upset him because they were not supposed to begin "sexual advances" without him in the room. Id. at 85. Pajakowski then became upset with Milewski, got off the bed, shut the door in Milewski's face, and continued to hold it shut. Id. at 88. Milewski then warned him that if he did not open the door, he would kick it in. Id. at 89. When Pajakowski did not open the door, Milewski kicked the door in and the two began "grappling." Id.

Once the physical conflict came to an end, Milewski demanded that Pajakowski and Stanek leave his trailer. Both Pajakowski and Stanek stalled for time, telling Milewski that they could not drive because they both had been drinking. Id. at 91. Milewski grew tired of the stalling, went to his bedroom and armed himself with a Ka-Bar knife. Id. at 92. He then pointed the knife toward them, gestured to the exit, and told them to "leave now." Id. at 93. Pajakkowski and Stanek left the trailer and Milewski followed them with the knife. Id. at 94–95.

The disturbance continued outside and was captured by a security camera at 3:34 a.m. on September 16, 2019. Security Footage at PageID.560–587 (Dkt. 39-6). Pajakowski yelled "F*** you and that f***ing knife . . . I'm going to f*** you up." Id. at 570. He then spoke to Milewski's next-door neighbor Jennifer Kincaid, telling her: "Ma'am . . . he's got a, he's got a knife. . . He's got a knife and he's drunk and he's kicking us out and shit. He's the one." Id. at PageID.586. Stanek told Milewski that she was going to come back with her sisters and "f*** [him] up." Milewski Dep. Tr. at 96. Pasjakwski and Stanek drove off and yelled out "we're coming back with f***ing guns." Kincaid Dep. Tr. at 17–18, 64–65 (Dkt. 39-7).

2

Another neighbor heard the disturbance and called 911. 911 Call at PageID.742 (Dkt. 39-9). That neighbor later explained:

> Things were escalating. You could hear it in the tone of their voice. They were becoming very loud and, and as I said, kind of—almost had like a violent tone to their voice, and I was kind of worried that the next point of escalation would be something, you know, breaking, or worse, someone getting hurt, or worse than hurt, I guess.

Trial Tr. vol. 2 at 199–200 (Dkt. 39-8) (Edward Gates).

A dispatch call went out to Sterling Heights Police Department regarding a "possible disturbance" and that the "caller could hear a group of people arguing as they were walking up and down the street." Dispatch Call PageID.753 (Dkt. 39-10). Officers Talia, Lopez, and Johnson arrived at the trailer park, in fully marked police uniforms and vehicles, and began canvassing for the source of the disturbance. Trial Tr. vol. 2 at 32–33, 36, 80–82, 85–87 (Dkt. 39-11) (Lopez); Trial Tr. vol. 3 at 8–10, 13 (Dkt. 39-4) (Johnson); Photos of Officers and Vehicles at PageID.869–873 (Dkt. 39-12).

Kincaid approached officer Talia and said that her neighbor was drunk outside, yelling, and chasing people with a knife; she also reported that the neighbor may still be outside. Dispatch Call at PageID.753; Trial Tr. vol. 2 at 83 (Talia). The officers turned off the headlights of their vehicles to avoid lighting themselves and exposing them to increased risk.[2] Trial Tr. vol. 3 at 11–12 (Johnson). The officers began canvassing outside with flashlights looking for the knife-wielding suspect. Id. at 12–15.

---

[2] "[Y]ou don't want to backlight yourself in any sort – type of situation. You don't want to be lighting up yourself . . . If someone is positioned let's say in front of myself in the darkness, if there was light coming from behind you, they will clearly be able to see you, but you will have more of an issue seeing them due to backlighting." Trial Tr. vol. 3 at 12 (Johnson).

3

The officers did not find anyone outside, but they heard loud yelling coming from Milewski's trailer and a loud bang. Id. at 18; Trial Tr. vol. 2 at 38–39, 53 (Lopez); id. at 89 (Talia). Milewski also heard the loud bang from inside his trailer, which he believes came from his backyard. Milewski Dep. Tr. at 98–100; Trial Tr. vol. 3 at 74–75 (Milewski).

Milewski said that because of Pajakowski and Stanek's "threats, and then the noise [he] heard in [his] back yard," he went and got a loaded Remington 800 12-guage pump action shotgun. Trial Tr. vol. 3 at 75 (Milewski); Milewski Dep. Tr. at 101. Meanwhile, because of the yelling and loud bang, the officers decided "to make contact just to see if everybody's ok." Trial Tr. vol. 2 at 89 (Talia). Officer Talia attempted to look "through the windows, but the blinds were all closed." Id. at 90. He could not see anything inside the trailer, so he planned to knock on the front door. Id.

Officer Johnson positioned himself toward the trailer's back door; Officer Talia went up the front steps to the front door; and Officer Lopez positioned himself behind and left of Officer Talia, in a grassy area by the bottom of the front stairs. Id. at 94, 117. Officer Talia unscrewed the porchlight because it was too bright for him to "see anything." Id. at 94. Without the porchlight there was still enough light in the area for the officers to see each other and their surroundings. Id. at 55 (Lopez); id. at 97 (Talia). After the porchlight was turned off, everything "completely went silent." Id. at 97 (Talia).

Unbeknownst to the officers, after getting his shotgun, Milewski went "straight to the front door." Trial Tr. vol. 3 at 75 (Milewski). He "observed the exterior porchlight turn off" and "knew someone was outside of [his] home and turned the light off so [he] could not see them." Pl. Notarized Discovery Resp. at 44 (Dkt. 39-17). Milewski quickly opened the trailer door with

4

shotgun in hand. Milewski Dep. Tr. at 71. He does not remember anything as of the time that he opened the front door until he woke up later in the hospital. Id.

When Milewski opened the door, Officer Talia turned his flashlight on, and Milewski raised and pointed the shotgun at him. Trial Tr. vol. 2 at 122 (Talia). From inside the trailer, Heythaler saw what "looked like light from a flashlight," and Milewski "raise his shotgun to his right shoulder in a high ready, firing position with the barrel of the shotgun pointed directly out the exterior of the storm door."[3] Heythaler Aff. at ¶¶ 56–57 (Dkt. 39-3).

Officer Talia did not have a chance to announce his presence, he "just had enough time to react." Trial Tr. vol 2, 76 (Talia). He quickly jumped down the stairway and retreated down the cement walkway leading away from the front door, yelling. Id. at 100–101, 123–124. As he did so, Officer Talia yelled: "Yo, put it down, gun, gun, gun." Id. at 123. He spun around, "unholstered [his] weapon," and brought it up to "face the door." Id. at 101.

Milewski came out of the trailer and onto the stairway landing with his shotgun pointed "down the steps" and "toward the road area" where Officer Talia was standing. Kincaid Dep. Tr. at 40–41, 47–49, 58, 86, 97; Talia Dash-Cam 3:20–3:23 (Dkt. 39-13). Despite Talia's instructions to put the gun down, Milewski did not drop the gun. Kincaid Dep. Tr. at 49. Milewski then started pointing the gun at Officer Lopez. Trial Tr. vol. 2 at 103 (Talia).

At that point Talia and Lopez feared for their lives, and the three officers opened fire on Milewski. Id. at 47, 77 (Lopez); id. 104 (Talia); Trial Tr. vol. 3 at 25–26 (Johnson). The use of deadly force lasted two seconds. Lopez Dash Cam at 10:47–10:49 (Dkt. 39-14); Talia Dash Cam

---

[3] While Milewski had swung open the front door, the storm door was still closed. Trial Tr. vol. 2 at 44 (Lopez).

5

at 3:21–3:23. Milewski sustained several gunshot wounds but survived his injuries. Milewski Dep. Tr. at 180.

Defendants move for summary judgment on all claims, raising qualified immunity as a dispositive issue. Defs. Mot. at 11–25. The Court agrees and awards judgment to Defendants on all claims.

## II. ANALYSIS[4]

### A. Excessive Force

The officers argue that they are entitled to qualified immunity on Milewski's § 1983 excessive force claim. "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Dominguez v. Correctional Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009) (punctuation modified). The plaintiff bears the burden of showing that government officials are not entitled to qualified immunity. See Untalan v. City of Lorain, 430 F.3d 312, 314 (6th Cir. 2005).

"In assessing qualified immunity, the court, viewing the facts in the light most favorable to the plaintiff, determines whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue was clearly established at the time of defendant's alleged misconduct." Grawey v. Drury, 567 F.3d 302, 309 (6th Cir. 2009) (punctuation modified). "The court may

---

[4] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). If a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court will grant the motion. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by presenting evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

6

address these prongs in any order, and if the plaintiff cannot make both showings, the [defendant] officer is entitled to qualified immunity." Brown v. Lewis, 779 F.3d 401, 412 (6th Cir. 2015). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Tolan v. Cotton, 572 U.S. 650, 656 (2014).

The Court first addresses prong one of the qualified immunity analysis: whether the officers violated Milewski's constitutional rights by shooting him with a firearm. Milewski asserts that the constitutional right at issue here is his Fourth Amendment right to be free from excessive force during his encounter with the officers. Pl. Resp at 5–7.

"A claim that the government used excessive force during the course of a seizure is analyzed under the Fourth Amendment's objective reasonableness standard." Chappell v. City of Cleveland, 585 F.3d 901, 908 (6th Cir. 2009) (punctuation modified). Determining whether a law enforcement officer's use of force is objectively reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (punctuation modified).

To determine whether the use of force was objectively reasonable, a court considers three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." Palma v. Johns, 27 F.4th 419, 428 (6th Cir. 2022) (punctuation modified). The use of deadly force is objectively reasonable if an officer has probable cause to believe a suspect poses an immediate threat of serious physical harm to the officer or others. Lee v. Russ, 33 F.4th 860, 863 (6th Cir. 2022). "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a

significant risk of serious injury or death." Greathouse v. Couch, 433 Fed. App'x 370, 373 (6th Cir. 2011).

Milewski alleges only one supposed factual dispute: whether he pointed a gun at officers Talia and Lopez. Pl. Resp. at 8. He asserts that he did not, and thus he did not pose an immediate threat to the safety of the officers or others. Id.

Officers Talia, Lopez, and Johnson all testified that Milewski pointed the shotgun at Talia and then Lopez. Trial Tr. vol. 2 at 44, 46–47 (Lopez); id. at 103 (Talia); Trial Tr. vol. 1 at 25 (Johnson). Eyewitness Heythaler gave a sworn statement that Milewski shouldered his gun to a "high ready, firing position with the barrel of the shotgun pointed directly out the exterior door," which is exactly where Officer Talia testified where he was standing and where the dash-cam video shows he was standing. Heythaler Aff. at ¶¶ 56–57; Talia Dash-Cam 2:56–3:45. Eyewitness Jennifer Kincaid testified that Milewski came out of his trailer with a shotgun with the barrel dangled "down the steps" and "toward the road area" which again is exactly where Officer Talia testified that he was standing and where the dash cam video shows him standing. Kincaid Dep. Tr. at 46–49, 51–52, 58, 86, 97.

Milewski has no memory of what transpired once he opened the door, so he has no basis to contradict the above testimony himself. See Milewski Dep. Tr. at 71. He does reference one piece of evidence in support of his position that he did not point the gun at an officer: the deposition testimony of Kincaid. That testimony, however, was equivocal. Kincaid testified that Milewski's shotgun "was pointed down." Kincaid Dep. Tr. at 43. Milewski asserts that "pointed down" means that that it was not pointed at the officers—or that the testimony, at least, creates a disputed issue of fact. See Pl. Resp. at 8.

8

While Kincaid testified that she did not see Milewski point the gun at an officer she admitted Milewski possibly could have done so.[5] Kincaid Dep. Tr. at 52. Further, she stated that Milewski pointed the gun "towards the steps," id. at 48, and "[t]oward the road area," id. at 49, which is where Officer Talia was standing. Even if Kincaid's testimony creates doubt about whether Milewski pointed the gun at Talia and Lopez after Milewski opened the storm door and went out onto the landing, there still is no dispute as to whether Milewski had already pointed his shotgun at Talia from inside the house, as Heythaler testified that she saw Milewski raise his shotgun to a "high ready, firing position with the barrel of the shotgun pointed directly out the exterior door," and Kincaid could not see Milewski until he went out on the landing. Id. at 41–42; Heythaler Aff. at ¶¶ 56–57.

Even if there was a triable issue of fact as to whether Milewski pointed the shotgun at Officers Talia and Lopez, the use of deadly force was still objectively reasonable under the situation Milewski created. A police officer is not required to wait for a firearm to be pointed at him before he is justified in using deadly force. Thomas v. City of Columbus, 854 F.3d 361, 365–366 (6th Cir. 2017) (rejecting a "categorical rule that force can only be reasonable if a suspect raises his gun").

For example, in King v. City of Columbus, Ohio, No. 23-3818, 2024 WL 3738581, at *3 (6th Cir. Aug. 9, 2024), the Sixth Circuit recently held that a police officer's use of deadly force was objectively reasonable when the plaintiff pulled a BB gun, which looked like a real gun, out of his pants and raised it above his torso. The plaintiff claimed that the use of deadly force was

---

[5] Q: Yeah, it was -- the gun could have -- his shotgun could have possibly been pointed at an officer, though he didn't mean to do it, simply by fact that he was up higher than them and it was pointed to the ground where they were standing; correct? A: I guess. I guess. Q: It's possible? A: Possible, yes. Kincaid Dep. Tr. at 52.

9

not justified because he "never pointed the BB gun at [the officer] and only pointed it downward." Id. at *4. Relying on the Sixth Circuit's decision in Thomas, the court rejected the plaintiff's argument because the severity of the crime at issue (a robbery) combined with plaintiff's ignoring the officer's order to get down, and beginning to tug at what appear to be a firearm in his pants during a five to eight second encounter "supports the conclusion that [the officer's] split-second judgment[], made during a rapidly evolving situation, was reasonable." Id. *3 (punctuation modified).

Milewski also takes issue with the officers leaving off the lights of their patrol vehicles and extinguishing the porch light. Pl. Resp. at 7. However, these issues are irrelevant in assessing the reasonableness of a use of force. Thomas, 854 F.3d at 365 ("We do not scrutinize whether it was reasonable for the officers to create the circumstances." (punctuation modified)). The question before the Court is "not whether it was reasonable for the police to create the circumstances." Dickerson v. McClellan, 101 F.3d 1151, 1161 (6th Cir. 1996). Rather the sole issue the Court considers is whether the officers' actions were objectively reasonable "at the time they made their split-second judgments immediately prior to using deadly force." Chappell, 585 F.3d at 909 (punctuation modified).

The Court grants Defendants' motion for summary judgment regarding Milewski's excessive force claim.

**B. Other Claims**

Milewski also brings a municipal liability claim against the City of Sterling Heights and state law claims against the officers, including gross negligence and intentional infliction of emotional distress. Compl. at ¶¶ 52–75.

10

Defendants move for summary judgment on all these claims. Milewski offers no response to any of Defendants' arguments. As such, he has forfeited any argument that these claims should survive summary judgment. See Briggs v. Univ. of Detroit-Mercy, 22 F. Supp. 3d 798, 811 (E.D. Mich. 2014) ("If a party fails to respond to an argument raised in a motion the court can assume that opposition to the motion is waived and the motion may be granted."). The Court grants summary judgment as a matter of law on the rest of Milewski's claims.

### III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment (Dkt. 39).

**SO ORDERED.**

Dated: September 30, 2025　　　　　　　　　　s/Mark A. Goldsmith
Detroit, Michigan　　　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2025.

　　　　　　　　　　　　　　　　　　　　　　s/Joseph Heacox
　　　　　　　　　　　　　　　　　　　　　　JOSEPH HEACOX
　　　　　　　　　　　　　　　　　　　　　　Case Manager